DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANGELA KAY KIRSCHNER** n/k/a **ANGELA KAY RAMSIER,**
Appellant,

v.

**JONATHAN JAY KIRSCHNER,**
Appellee.

No. 4D17-851

[April 25, 2018]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Sherwood Bauer, Jr., Judge; L.T. Case No. 2013 DR 2869.

Martin L. Haines, III of Brinkley Morgan (formerly of Martin L. Haines, III, Chartered), Lake Park, for appellant.

Jonathan Jay Kirschner of Jonathan Jay Kirschner Esq. & Associates, LLC, Fort Pierce, for appellee.

***ON APPELLEE'S MOTION FOR CLARIFICATION/REHEARING***

GERBER, C.J.

We grant appellee's motion for clarification/rehearing as to the factual points raised in paragraphs 2.A. and 2.B., deny the remainder of appellee's motion for clarification, withdraw our opinion dated January 24, 2018, and substitute the following opinion in its place.

The former wife appeals from the circuit court's final order partially denying her motion to enforce the final judgment regarding the parties' marital settlement agreement ("MSA") as amended by an addendum. The former wife raises several arguments, two of which we conclude have merit: (1) the court erred when it interpreted the MSA addendum as unambiguously treating the former husband's sale or refinance of the parties' former marital home as a condition precedent to the former husband's obligation to pay the former wife's equitable distribution; and (2) the court erred when it found that the former husband made diligent efforts to sell and refinance the home. We agree with these arguments and reverse for an evidentiary hearing to resolve the ambiguity as to when and

how the former husband, without the sale or refinance of the home, would become obligated to pay the former wife's equitable distribution.

We present this opinion in the following sections:
1. the procedural history;
2. the circuit court's findings; and
3. our review of
   a. the circuit court's error in interpreting the MSA addendum; and
   b. the circuit court's error in finding the former husband made diligent efforts to sell and refinance the marital home.

## *1. Procedural History*

The MSA's original paragraph four stated, in pertinent part:

> 4. SALE OF MARITAL DWELLING: The parties agree to sell the marital dwelling above-referenced. The marital dwelling shall first be listed independently, or though [*sic*] an internet based listing service without use of a broker. The dwelling shall be listed at a price mutually agreed upon by the parties. In the event a sale is unable to be made by the method outlined above, the parties agree to list the marital dwelling with [a] Florida Registered Real Estate Broker chosen by mutual agreement of the parties, at a price to be mutually agreed upon by the parties.
>
> The parties agree to sell the marital dwelling at or near it's [*sic*] fair market value, and neither party's agreement to sell shall be unreasonably withheld. . . .

Later, the parties agreed to amend the MSA through an addendum which stated, in pertinent part:

> Paragraph number 4 of that certain Agreement styled "Marital Settlement Agreement[,]" executed by the parties on March 7, 2007, relating to "Sale of Marital Dwelling" is and shall be modified to the following extent:
>
> The parties acknowledge and agree that the fair market value of the marital dwelling . . . is $725,000.00.
>
> The parties acknowledge and agree that their [*sic*] exists a first mortgage on said property . . . with an outstanding payoff amount of $328,000.00.

2

The parties likewise agree that the total equity position in the property, as it currently exists, is $397,000.00, and both the Husband and the Wife are entitled to one-half of that amount (50%) to wit: $198,500.00 each.

Upon execution of this agreement, the Wife agrees to execute an instrument conveying all of her right, title and interest in the marital dwelling to the Husband. The parties agree that the Husband shall, within ten (10) days of the date this Addendum is executed by both of the parties with appropriate formalities, pay to the Wife the sum of $80,000.00.

The parties acknowledge and agree that the remaining sum due to the Wife, to wit: $118,500.00, shall be paid to the Wife, at the time of closing. The house will be sold pursuant to the provisions of paragraph number 4 of the "Marital Settlement Agreement" . . . .

In the event the marital dwelling is not sold within five (5) years of the date this Agreement is executed, the Husband agrees to make diligent efforts to refinance the property, in order to pay to the Wife, the remaining sum due to her, of $118,500.00.

The Wife shall be entitled to no other monies, irrespective of the ultimate sale price of the marital dwelling, and should the marital dwelling sell for less than $725,000.00, then the Husband shall pay to the Wife, by any means available to him, the sum of $118,500.00.

The circuit court entered a final judgment approving of the MSA as amended by the addendum.

Six years later, the former wife filed a motion to enforce the final judgment regarding the MSA as amended. Among other things, the former wife asked the circuit court to:

[R]equire the Former Husband to pay to the Former Wife the sum of One Hundred Eighteen Thousand Five Hundred Dollars ($118,500), together with interest, immediately. In the event the Court deems it necessary for the Former Husband to first sell or refinance the Former Marital Home in order to

3

pay to the Former Wife the sum of One Hundred Eighteen Thousand Five Hundred Dollars ($118,500), the Court should Order same to be done immediately.

At the evidentiary hearing on the former wife's motion, the parties agreed that pursuant to the MSA addendum's terms, the former wife quitclaimed her interest in the former marital home to the former husband, the former husband paid $80,000 to the former wife, and the former husband still owed $118,500 to the wife. The remainder of the hearing focused on the former husband's unsuccessful efforts to sell or refinance the former marital home.

The former husband testified that, at the time of the evidentiary hearing, the former marital home had been listed on the real estate market for several months at $725,000, which was above its then fair market value. Before that listing, the home had not been listed for approximately seven years. Seven years earlier, the former husband listed the home for $979,000, which also was above its fair market value. The parties stipulated that the former husband's realtor showed the home several times when it was first listed, but the home did not receive any offers.

The former husband testified that he did not list the home during that seven year period because the home was "underwater," had depreciated in value by 65%, and listing the home would have been futile. The former husband admitted that during this time, he was not motivated to sell the home to satisfy his equitable distribution obligation to the former wife, because, as documented in a letter he sent to the former wife's counsel, she would "attain her desired windfall, leaving nothing remaining for me."

The former husband testified that, after he was unable to sell the home, he attempted four times to refinance. His first attempt was denied due to insufficient collateral, as the home's fair market value was listed at $367,951. His later attempts were denied because he was not current on his mortgage payments. He attempted to refinance even though he thought he would not qualify. However, his most recent attempt was only four years before the evidentiary hearing. He said that he would make another attempt to refinance and expected to be successful.

The former husband felt he had no obligation to make the $118,500 equitable distribution payment to the former wife until he sold or refinanced the home. According to the former husband, the MSA addendum provided that only if he sold or refinanced the home and was unable from those funds to make the $118,500 equitable distribution payment to the former wife would he be required to find an alternative

4

payment method. The former husband agreed that if he sold the home for an amount between $585,000 and $600,000, he would be able to pay off the home's two mortgages and make the $118,500 equitable distribution payment to the former wife.

Towards the end of the former husband's testimony, the following discussion occurred between the court and the former husband:

> THE COURT: [A]s I read [the MSA addendum], you know, the house part, "It is acknowledged and agreed the remaining sum due the Wife, the 118,[500] shall be paid to the Wife at the time of closing. In the event it's not sold within five years, the Husband agrees to make diligent efforts to refinance the property in order to pay the Wife." It's not in order that both of you walk away with some money. It's in order to pay the Wife the remaining sum due to her of 118,5[00]. And it even has the condition that should the marital dwelling sell for less than 725,[000] the Husband shall pay the Wife by any means available to him the sum of 118,5[00]. So you guys actually contemplated the house not selling for enough, not selling at a high enough rate or sale price to pay her the 118[,500] that you would otherwise get money from whatever means possible.
>
> [FORMER HUSBAND]: I was trying to be fair in the agreement and guarantee her that money.
>
> THE COURT: So you['re] not selling the home at a rate lower than what would pay her off and leave you some additional funds would mean that this is an endless contract, that you could just keep waiting and waiting and waiting and waiting, right?
>
> [FORMER HUSBAND]: Judge, I've listed it at 725[,000]. That doesn't mean that I wouldn't sell it for less. Putting it above market is for the purpose of getting lucky.

Following the testimony, the former wife argued that the MSA addendum did not contain a condition precedent that the former husband be able to sell or refinance the home before being required to make the $118,500 equitable distribution payment to the former wife. According to the former wife, if the court read such a condition precedent into the MSA addendum, then she never would be paid the remaining $118,500 if the former husband never sold or refinanced the home.

In response, the former husband argued that the former wife's request for him to make the $118,500 equitable distribution payment without the sale or refinance of the home would require the court to impermissibly rewrite the MSA addendum. According to the former husband, the MSA addendum's plain language created a condition precedent that he would not be required to make the $118,500 equitable distribution payment to the former wife until he sold or refinanced the home. The former husband argued that the former wife's only remedy was to have the court reduce the debt to a money judgment.

## 2. The Circuit Court's Findings

After the evidentiary hearing, the circuit court entered a final judgment stating, in pertinent part:

> The Former Wife seeks a ruling that the Court determine that neither the sale nor the refinancing of the former marital residence are conditions precedent to payment by the Former Husband to the Former Wife of One Hundred Eighteen Thousand Five Hundred Dollars ($118,500). However, to do so would require a "rewriting" of the terms of the Agreement entered into by the parties. Although the agreement does not specifically state that the sale or refinancing is a condition precedent to the payment, a review of the entire agreement and the clear intent of the parties that the payment would be made after the sale of the home or refinancing of the home results in the determination that the condition exists. *Reilly v. Reilly*, 94 So. 3d 693 (4th DCA 2012). Noteworthy also is that the agreement also does not require the payment of the $118,500.00 at any specific time, or within any time period, other than after sale or refinancing. It does require that "[t]he house will be sold pursuant to the provisions of paragraph number 4 of the 'Marital Settlement Agreement' executed by the parties on March 7, 2007" and if the home does not sell within five (5) years of the agreement, then "the Husband agrees to make diligent efforts to refinance the property, in order to pay the Wife, the remaining sum due to her, of $118,500.00." The unrefuted testimony of the Former Husband was that the marital home was the primary marital asset and its division was the major part of the equitable distribution agreement. It was to be used, either upon sale or a refinancing "in order to pay the Wife, the remaining sum due to her, of $118,500.00." Only if the marital dwelling should

6

"sell for less than $725,000.00, then the Husband shall pay to the Wife, by any means available to him, the sum of $118,500.00." It is clear in the agreement that the home's equity was to be the primary source for the payment of the money to the Former Wife.

. . . .

A marital settlement agreement is interpreted like any other contract. Absent any evidence that the parties intended to endow a special meaning in the terms used in the agreement, the unambiguous language is to be given a realistic interpretation based upon the plain, everyday meaning conveyed by the words. *See Feliciano v. Munoz-Feliciano*, 190 So. 3d 232 ([Fla.] 4th DCA 2016). Also, quoting *Feliciano, Id.* at 234, "[h]ad the parties intended this to be a general debt obligation, such a contract would have been simple to craft, as they simply could have omitted the 'from the other parties share of the proceeds' clause. Given that the parties chose to include this language in the contract it must be given some meaning. Here, that meaning is clear." As noted earlier in this matter, the parties chose to use the words ". . . shall be paid to the Wife at the time of closing . . ." and ". . . diligent efforts to refinance the property, in order to pay the Wife, the remaining sum due to her, of $118,500.00." Although the Former Wife argues that the agreement should be interpreted as requiring a general debt obligation, which could be viewed as being a reasonable requirement in order to finalize the equitable distribution of the asset, the Court cannot modify the agreement for a specific result. The Former Wife was to be paid after closing on the home or upon the refinancing of the home.

(emphasis omitted).

The court went on to find that although the MSA's original paragraph four stated that the home would be listed "at a price mutually agreed upon by the parties," no evidence was presented at the evidentiary hearing that the parties ever discussed or agreed upon a listing price. Thus, the court held the former husband was not required to list the home at any particular price. Moreover, the court found the home "almost continuously remained on the market since [2008]."

As for the MSA addendum's provision that if the home did not sell within five years, the former husband was required to make diligent efforts to refinance the home to satisfy the monetary obligation to the former wife, the court found:

> Although the term "diligent" is not defined in the agreement, a common definition would include that the Former Husband be attentive and persistent in attempting to accomplish the act of refinancing the home. The evidence includes that the Former Husband attempted refinancing in 2013 and 2014, with a total of 4 attempts. In 2014 the Former Husband fell behind on the making of the mortgage payments, then was able to get caught up, but fell behind again leading to the foreclosure action . . . . As the dismissal of the foreclosure action occurred in November, 2016, the Former Husband testified that he is unable to refinance after so recently working out a remedial modification of his original loan to stop the foreclosure action. The Husband has the continuing obligation to diligently make efforts to refinance the home in order to satisfy the payment obligation to the Former Wife. While the Court finds herein that the Former Husband has, thus far, been diligent in that regard and that the recent foreclosure action has caused a further delay in the fulfillment of this obligation, the obligation nevertheless exists and the Former Husband must be diligent in attempting to refinance the home[.]

Based on the foregoing findings, the circuit court denied the former wife's motion to require the former husband to make the $118,500 equitable distribution payment to the former wife.

This appeal followed. The former wife argues the circuit court erred when it: (1) interpreted the MSA addendum as unambiguously treating the former husband's sale or refinance of the parties' former marital home as a condition precedent to the former husband's obligation to pay the former wife's equitable distribution; and (2) found that the former husband made diligent efforts to sell and refinance the home. We review each argument in turn.

### 3. Our Review

### a. The circuit court erred in interpreting the MSA addendum.

8

"The interpretation of the wording and meaning of the marital settlement agreement, as incorporated into the final judgment, is subject to de novo review. A marital settlement is interpreted like any other contract." *Feliciano v. Munoz-Feliciano*, 190 So. 3d 232, 233–34 (Fla. 4th DCA 2016) (internal citations omitted). "A settlement agreement should not be disturbed unless found to be ambiguous or in need of clarification, modification, or interpretation." *Ballantyne v. Ballantyne*, 666 So. 2d 957, 958 (Fla. 1st DCA 1996). "As a general rule, conditions precedent are not favored, and the courts will not construe provisions to be such, unless required to do so by plain, unambiguous language or by necessary implication." *Reilly v. Reilly*, 94 So. 3d 693, 697 (Fla. 4th DCA 2012) (citation omitted).

We agree with the former wife that the court erred when it interpreted the MSA addendum as treating the former husband's sale or refinance of the parties' former marital home as a condition precedent to the former husband's obligation to pay the former wife's equitable distribution. We conclude the MSA addendum was ambiguous on this issue.

*Reilly v. Reilly*, 94 So. 3d 693 (Fla. 4th DCA 2012), is instructive. In *Reilly*, per the MSA's equitable distribution scheme, the parties agreed, in pertinent part, to the following: "The Husband agrees to pay the Wife $15,177 from his share of the closing proceeds [from the sale of the former marital home] as and for equitable distribution." *Id.* at 696. Later, the marital home sold, but the sale did not produce profit. *Id.* The husband argued that the MSA's language created a condition precedent: if he received no proceeds from the home's sale, he was not required to pay the wife $15,177 as referenced in the MSA. *Id.* We rejected the husband's argument, reasoning:

> In the equitable distribution provision . . . there are no phrases of conditional performance. The former husband agreed to pay the former wife $15,177 as and for equitable distribution. Payment from the closing proceeds is not a condition precedent, only a source for the payment. The MSA was entered into more than a year before the parties sold the marital home so the parties did not know how much the proceeds of the sale would be. The MSA is silent as to what would happen if the proceeds were not enough but the $15,177 is specifically labeled as and for equitable distribution and is owed to the former wife. The trial court did not err in ordering the former husband to pay the former wife $15,177 as and for equitable distribution.

*Id.* at 697.

Here, as in *Reilly*, the MSA addendum contains no phrases of conditional performance. In essence, the former wife gave up her fifty percent interest in the former marital home in exchange for the husband's promise to pay her $118,500.00 in equitable distribution. Payment from sale proceeds or from a refinance is not a condition precedent, but only a source for the payment. The $118,500 is specifically labeled as being "due to the Wife." The MSA addendum's final sentence, which required the former husband to find an alternate payment method should the sale or refinancing result in insufficient funds, supports our interpretation.

However, this case is slightly distinguishable from *Reilly*, because in *Reilly*, the sale which the MSA contemplated in fact occurred (albeit for less money than the former husband anticipated), whereas here, the sale or refinance which the MSA addendum contemplated has not occurred. The MSA addendum is silent as to what would happen if the sale or refinance did not occur. In other words, without a sale or refinance, when and how would the former husband become obligated to make the $118,500 equitable distribution payment to the wife?

Because the MSA addendum does not answer that question, the MSA addendum is ambiguous. A contract contains a latent ambiguity where the "contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings." *Schwartz v. Greico*, 901 So. 2d 297, 299 (Fla. 2d DCA 2005) (citation omitted). "[T]he latent ambiguity, which was not apparent at the time the contract was created, is revealed by the 'certain situation' that occurs during the performance of the contract." *Id.* at 300.

Here, that "certain situation" occurred when the former husband was unable to sell or refinance the home, and the MSA did not define when and how the former husband, without the sale or refinance, would become obligated to make the $118,500 equitable distribution payment to the wife. Thus, the circuit court was required to receive extrinsic evidence to determine the parties' intent when they entered into the contract as to how to handle that "certain situation." *See White v. White*, 141 So. 3d 645, 646 (Fla. 4th DCA 2014) (when an MSA is ambiguous or unclear, the circuit court "may consider extrinsic evidence as well as the parties' interpretation of the contract to explain or clarify the language.") (citation omitted).

*Crespo v. Crespo*, 28 So. 3d 125 (Fla. 4th DCA 2010), also is instructive. In *Crespo*, the parties' MSA stated that the husband owed the wife

$145,000 as equitable distribution, and "in recognition of and exchange for the funds Wife shall receive for equitable distribution" the wife would give up any rights to a building which would solely belong to the husband. *Id.* at 127. The MSA did not specify a date of payment. *Id.* The wife later moved to enforce the MSA, arguing that payment was due immediately. *Id.* The husband argued the parties understood when the MSA was signed that the building's sale was the only possible source for payment. *Id.* The circuit court found the due date's absence in the MSA to be an ambiguity necessitating the consideration of extrinsic evidence. *Id.*

We affirmed, concluding that "[t]he MSA failed to specify a time for payment and was thus ambiguous as to the intent of the parties in that regard." *Id.* at 128. Thus, the circuit court properly decided to consider extrinsic evidence as to the parties' intent. *Id.* We also pointed out that "[t]he factual resolution of such an ambiguity as to the due date of the payment does not modify their agreement; it merely clarifies the inherent ambiguity therein." *Id.*

Here, like in *Crespo*, the MSA addendum failed to specify when and how the former husband, without the sale or refinance of the home, would become obligated to make the $118,500 equitable distribution payment to the wife. Thus, the circuit court should have considered extrinsic evidence as to the parties' intent. The factual resolution of such an ambiguity would not, as the circuit court here suggested, impermissibly modify the parties' agreement. Instead, such a ruling merely would clarify the ambiguity.

### b. The circuit court's error in finding the former husband made diligent efforts to sell and refinance the marital home.

"We review the trial court's factual findings to determine whether they were supported by competent and substantial evidence." *Segarra v. Segarra*, 947 So. 2d 543, 545 (Fla. 3d DCA 2006).

We agree with the former wife that competent, substantial evidence did not support the circuit court's findings regarding the former husband's efforts to sell and refinance the home.

The court found that the former husband had no obligation to list the former marital home at any particular price because the evidence showed the parties never discussed a sale price. However, Paragraph 4 of the MSA provided, in pertinent part: "The parties agree to sell the marital dwelling at or near it's [*sic*] fair market value." The MSA addendum provided, in pertinent part: "The parties acknowledge and agree that the fair market value of the marital dwelling . . . is $725,000.00."

The circuit court also found that the former husband made diligent efforts to sell the home, and that the former marital home "almost continuously remained on the market since [2008]." However, the husband admitted at the hearing that he did not list the home for a seven year period, and the record reflects that the husband never attempted to list the former marital home at its actual fair market value. The husband initially listed the home for sale at $979,000, well above the parties' agreed fair market value of $725,000. By the time the former husband listed the home at the parties' agreed fair market value of $725,000, this price was above the actual fair market value. Based upon an unsolicited realtor's appraisal and the former husband's own application for loan modification, the actual fair market value could have been anywhere between $409,000 and $499,870.

The circuit court should have concluded from these facts that the former marital home may not have sold because the former husband's asking price was consistently too high. The court also should have concluded that the former husband listed the home at an unrealistic price. The former husband interpreted the MSA's addendum to mean that if the home never sold and he was not able to refinance, then he would never be obligated to pay the equitable distribution to his former wife. And the former husband also openly admitted that he had no motivation to sell the home merely to satisfy his financial obligation to the former wife.

The circuit court's finding that the husband made four diligent efforts to refinance is also problematic. The former husband testified he thought he would not qualify for refinancing for a variety of reasons, including his impending foreclosure, and he attempted to refinance only because he felt obligated to do so.

Despite our conclusion that the circuit court erred in its findings regarding the former husband's efforts to sell and refinance the home, the result of the court's error remains the same as the result arising from the court's error in interpreting the MSA addendum. Because the MSA addendum failed to specify the outcome if the former husband did not sell or refinance, for whatever reason, the circuit court should have considered extrinsic evidence as to the parties' intent regarding how to handle that "certain situation."

### *Conclusion*

Based on the foregoing, we reverse the circuit court's final order partially denying the former wife's motion to enforce the final judgment

regarding the MSA as amended by the addendum. We remand for an evidentiary hearing to resolve the ambiguity as to when and how the former husband, without the sale or refinance, would become obligated to make the $118,500 equitable distribution payment to the wife. On all other arguments which the former wife raises, we affirm without further comment.

*Affirmed in part, reversed in part, and remanded.*

CIKLIN and LEVINE, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**